## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CLARENCE J. KIRK,** | : | **CIVIL NO. 1:CV-11-00665** |
| | : | |
| **Plaintiff** | : | **(Judge Rambo)** |
| | : | |
| **v.** | : | |
| | : | |
| **WYOMING COUNTY** | : | |
| **CORRECTIONAL FACILITY,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

## M E M O R A N D U M

Plaintiff Clarence J. Kirk ("Kirk"), an inmate currently confined at the State Correctional Institution in Pittsburgh, Pennsylvania, initiated this civil rights action with a complaint filed pursuant to the provisions of 42 U.S.C. § 1983 on April 11, 2011, as amended January 26, 2012. (Doc. 29.) Named as Defendants are Nurse Pendleton and Gary D. Russell, M.D., two medical providers at Kirk's former place of confinement, the Wyoming County Correctional Facility ("WCCF") in Tunkhannock, Pennsylvania. In his amended complaint, Kirk alleges that Defendants were deliberately indifferent to his serious medical needs with respect to an injury he sustained in April 2009.

Presently before the court are two motions for summary judgment, filed by Defendants Nurse Pendleton and Dr. Russell. (Docs. 41 & 45.) For the reasons set forth below, the motions for summary judgment will be granted in part and denied

in part.

I. **Background**

In the amended complaint, Kirk makes the following allegations. On April 19, 2009, while proceeding from the second-tier level to the lower level day room at WCCF, he tripped on a metal strip protruding on the steps. (Doc. 29 ¶¶ 5, 6.) He fell down approximately eight (8) to ten (10) steps and landed on his left shoulder and middle back, and twisted his ankle. (*Id*. ¶ 7.) The second shift sergeant, a Sergeant Smith, wrote an incident report, and Kirk submitted a sick call slip to the medical department, presumably that same day. (*Id*. ¶ 8.)

On April 23, 2009, Nurse Pendleton called Kirk to the medical department. (*Id*. ¶ 9.) Kirk alleges that Nurse Pendleton was "personally involved via, ignoring plaintiff's cry of excrutiating [sic] pain," presumably during the four days between the submission of the sick call slip and his visit to the medical department. (*Id*. ¶ 9.) Upon examination, Nurse Pendleton gave Kirk an ace bandage and velcro-strip sandals with an ice bag. (*Id*. ¶ 10.)

Kirk next alleges that "eventually" Dr. Russell examined him "only after further complaints of pain and suffering continuing delay and chronic care." (*Id*. ¶

2

11.)  He also alleges that Dr. Russell was "personally involved via, ignoring plaintiff's chronic suffering." (*Id*.)  Dr. Russell ordered an x-ray of Kirk's right shoulder, even though Kirk had complained to him of pain in his left shoulder. (*Id*. ¶ 12.)  When Kirk asked Dr. Russell to take an x-ray of his ankle and back, Dr. Russell responded, "We're not talking about that now." (*Id*. ¶ 13.)  Dr. Russell then asked Kirk if he believed in God, and when Kirk responded that he did, Dr. Russell stated, "Pray for a healing!" (*Id*. ¶ 14.)

Thereafter, Kirk continued to submit sick call requests to Nurse Pendleton and Dr. Russell, but they were ignored. (*Id*. ¶ 15.)  However, on August 12, 2009, Kirk was transported to Geisinger Medical Center for care. (*Id*. ¶ 16.)  Kirk alleges that he continues to suffer from severe shoulder, ankle, and back injuries. (*Id*.)

### A.    <u>Facts</u>

In support of their motions for summary judgment, Defendants Nurse Pendleton and Dr. Russell submitted statements of material facts. (Docs. 42 & 47.) Kirk initially filed answers to the statements of facts, (*see* Docs. 63 & 64), but subsequently submitted counter statements of material facts, (*see* Docs. 70 & 71.) Thus, the court will note any factual disputes between the parties by presenting both parties' contentions.

According to Nurse Pendleton, she examined Kirk immediately after his fall on April 19, 2009. (Doc. 42 ¶ 3; Doc. 44 ¶ 3, Pendleton Aff.) Based upon her examination, Nurse Pendleton believed that Kirk suffered a sprain to his left ankle. (Doc. 42 ¶ 4; Doc. 44 ¶ 4.) She advised him to elevate, rest, and apply ice to his injured leg. (Doc. 42 ¶ 5; Doc. 44 ¶ 5.) She also provided him with an ace bandage and sandals. (Doc. 42 ¶ 5; Doc. 44 ¶ 5.) Nurse Pendleton then consulted with Dr. Russell, who indicated that the prescribed treatment was appropriate and his intervention was unnecessary at that time. (Doc. 42 ¶ 9; Doc. 44 ¶ 6.)

Nurse Pendleton also asserts that she examined Kirk on April 23, 2009, and advised him to continue to apply ice packs and wear an ace bandage. (Doc. 42 ¶ 10; Doc. 44 ¶ 7.) According to Nurse Pendleton, when Kirk continued to complain, she referred him for evaluation with Dr. Russell, who ordered x-rays. (Doc. 42 ¶ 11; Doc. 44 ¶ 8.) Kirk was ultimately treated at the Geisinger Medical Center on August 12, 2009. (Doc. 42 ¶ 12; Doc. 44 ¶ 9.)

Kirk denies many of these statements in his counter statement of material facts, citing the medical records Nurse Pendleton attaches to her affidavit.[1] (Doc. 70.)

---

[1] Specifically, Kirk disputes Nurse Pendleton's assertion that she examined him "immediately" after the fall or on April 23, 2009. (Doc. 70 ¶¶ 3, 10.) In addition, he states repeatedly that until further discovery can be completed, he does not have any information or belief as to the truth of Nurse Pendleton's statements and, therefore, denies her statements. (Doc. 70.)

Those medical records reveal the following.  On April 19, 2009, Kirk submitted a request for medical attention, complaining that he fell down steps and twisted his ankle.[2]  (Doc. 44 at 6.)  Nurse Pendleton examined Kirk on April 21, 2009, noting swelling in Kirk's left ankle, and referred him for an x-ray.  (*Id*.)  She also noted "no indication of bruises or marks on back, etc."  (*Id*.)

---

By order dated April 9, 2012, the court ordered discovery in this case closed on June 8, 2012. (*See* Doc. 39.)  In his brief in opposition to the instant motions for summary judgment, Kirk, presently represented by counsel, states the following with respect to this case's deadlines:

> Mr. Kirk, a man who has not graduated high school and who up until this point acted *pro se*, was confused by the Court's Order and because of this confusion failed to answer the Interrogatories provided to him by the Defendants and the Requests for Production of Documents also provided to him by the Defendants.  He also was not aware that he could initiate discovery of his own.  Mr. Kirk then retained the services of the undersigned during the week of July 2, 2012.  As such, Mr. Kirk is currently ready and able to provide the requested discovery to the Defendants and has filed contemporaneously with this Brief a motion to reopen discovery so that he may seek out the discovery guaranteed to him by the Federal Rules of Civil Procedure.

(Doc. 65 at 3-4.)  By order dated August 31, 2012, the court denied the motion to reopen discovery, as the instant motions for summary judgment were already ripe for disposition. (*See* Doc. 73.)  Here, the court notes that on April 11, 2011, Kirk was provided with this court's Standing Practice Order which references the Local Rules and highlights the important responsibilities he has while litigating his case, including information relating to the filing of motions and briefs, as well as depositions and discovery. (Doc. 4.)  Because Kirk has been aware of his responsibilities in this case since receiving the Standing Practice Order, and as there is nothing on the record such as correspondence from Kirk regarding his alleged confusion as to this court's April 9, 2012 case management order, the court will consider the instant motions for summary judgment as filed and without directing further discovery.

[2]  Kirk dates his request April 17, 2009.  (Doc. 44 at 6.)  Because the parties do not cite that April 17, 2009 date anywhere in their filings, and instead concur in the April 19, 2009 date for the fall, the court will cite the April 19, 2009 date as the date of Kirk's fall.

On April 24, 2009,[3] Kirk submitted an inmate complaint form with the following complaint: "On April 17, 2009, I fell 4 to 6 steps twisting my ankle and toes, my back also has contusions in many places. My ankle, toes, leg are swollen turning various colors. My neck still hurts, and lower back, sholder [sic] blades . . . ." (Doc. 44 at 5.) Nurse Pendleton's attached note is illegible for the most part, but the court is able to decipher that she examined the swelling in Kirk's left foot and prescribed a hot shower. (*Id.*) In addition, Nurse Pendleton asserts there are no other requests or complaint forms in the medical department's records that reference Kirk's fall. (Doc. 42 ¶ 8.) Finally, she asserts that she was not directed to give Kirk any further treatment beyond what she claims here and in her treatment notes for any injuries he suffered on April 19, 2009. (Doc. 44 ¶ 10.)

With respect to Dr. Russell, he asserts the following. At all times relevant to Kirk's complaint, Dr. Russell was employed as a family physician at a Geisinger Clinic located in Nicholson, Pennsylvania. (Doc. 57 at 2, Russell Aff.) As part of his duties, Dr. Russell was responsible for responding to requests for medical attention for inmates incarcerated at WCCF. (*Id.*) Requests for medical attention for inmates are sent to his office by WCCF's nurse, the assistant warden, or an officer in charge,

_____

[3] The complaint is dated April 24, 2009, but signed by Kirk on April 25, 2009. (Doc. 44 at 5.)

rather than directly by inmates. (*Id*.) At no time was Dr. Russell ever contacted directly by Kirk with a request for medical attention.[4] (Doc. 57 at 2; Doc. 47 ¶ 1.)

The first time Dr. Russell received a request for medical attention for Kirk was in mid-July 2009. (Doc. 47 ¶ 2; Doc. 57 at 2.) Dr. Russell traveled to WCCF on July 13, 2009 to examine Kirk. (Doc. 47 ¶ 3; Doc. 57 at 2.) According to Dr. Russell's affidavit, his handwritten notes indicate the following:[5]

> Plaintiff reported to me at that time that he had injured his left ankle when he fell down step[s] twisting his ankle on April 19, 2009, at 2108 hours. The plaintiff further reported that there was no history of a prior injury, that it was tender to walk on it after the injury, that he was still with burning pain around the ankle and had tingling through the toes.

> My examination notes that the Plaintiff was a white male in no apparent distress, that there was slight swelling around the left ankle, minimal range of motion and that the ankle was nontender.

> The handwritten documentation also notes an assessment and plan of a history of a sprain, a prescription for range of motion exercises and to follow the patient clinically.

---

[4] In his counter statement of material facts, Kirk denies that Dr. Russell was never contacted directly by him, citing to the medical records attached as exhibits to Dr. Russell's affidavit. (Doc. 71 ¶ 1.) However, after careful review of these records, the court concludes that there is nothing in those records indicating that Dr. Russell was ever contacted directly by Kirk. (*See* Doc. 57, Exs. A & B.) As such, Dr. Russell's statement (Doc. 47 ¶ 1) is deemed undisputed.

[5] Dr. Russell's handwritten notes are attached as an exhibit to his affidavit. (*See* Doc. 57 at 10-12, Ex. A.) In his affidavit, Dr. Russell asserts that the attached medical records constitute the entirety of the documentation of his care and treatment of Kirk. (Doc. 57 at 7.)

(Doc. 57 at 3; *see also* Doc. 47 ¶¶ 4-5.)

Dr. Russell received a second request for medical attention for Kirk on July 29, 2009. (Doc. 57 at 3.) He traveled to WCCF on July 30, 2009 to examine Kirk again. (*Id.*) According to Dr. Russell's affidavit, his handwritten notes indicate the following:[6]

> [On July 30, 2009,] Plaintiff complained that his shoulder and back were hurting, that his elbow was not getting better and that he complained of right shoulder pain in the middle of his neck and middle of his neck [sic] since April 19, 2009. The documentation also notes that the plaintiff stated that he had no back or shoulder pain prior to that and that the nurse then asked him about falling off a roof to which he responded by stating that he had "tucked and rolled when he hit the ground" and had 26 stitches.

> The documentation of my physical examination noted a white male in no apparent distress, a face with a scar on the forehead, shoulders with normal range of motion and a scapular that was nontender with no palpable defect. The Plaintiff's arms had normal range of motion and were nontender. The Plaintiff's back and neck are also noted to have normal range of motion and to be nontender. A neurological examination is documented as muscle strength rated as a 5 out of a scale of 5 and positive deep tendon reflexes.

> The Plaintiff's legs are also noted to be within normal limits with no edema except for slight swelling of the left ankle. Mr. Kirk was noted to have a good range of motion in the left ankle until I advised him that I was checking range of motion at which point he stiffened up the ankle.

---

[6] *See supra* note 5, at 7.

The assessment and plan are documented as number one, complaining of pain in the right shoulder and to check an x-ray of the right shoulder, a history of ankle sprain three months ago and a prescription for range of motion exercises and with respect to the right elbow, an ulnar neuropathy with a recommendation to avoid pressure on the elbow.

(*Id*. at 3-5; *see also* Doc. 47 ¶¶ 7.)[7]

Also on July 30, 2009, Dr. Russell ordered an x-ray of Kirk's right shoulder. (Doc. 47 ¶ 8; Doc. 57 at 5.) Kirk underwent that x-ray of his right shoulder at Geisinger Clinic on August 5, 2009. (Doc. 47 ¶ 9; Doc. 57 at 5.) The x-ray was interpreted by the radiologist there as showing age appropriate osseous structure and articulations with the shoulder girdle satisfactorily aligned and/or maintained. (Doc. 47 ¶ 9; Doc. 57 at 5, 19.)

Dr. Russell also adds the following statements with regard to his treatment of Kirk. First, he did not ignore any complaints voiced by Kirk to him, and it is his custom and practice to record every complaint a patient may have. (Doc. 47 ¶ 10; Doc. 57 at 5.) Further, Kirk did not ask him to x-ray his ankle and back. (Doc. 47 ¶

---

[7] In his counter statement of material facts, Kirk denies Dr. Russell's statement, "On July 30, 2009, the Plaintiff complained that he had right shoulder pain," (Doc. 47 ¶ 7), stating that Kirk "also clearly stated complaints to areas of his body other than solely his right shoulder," (Doc. 71 ¶ 7). As Dr. Russell's affidavit clearly indicates that Kirk complained of right shoulder pain as well as pain in his back, neck and elbow, and stiffness in his left ankle, (Doc. 57 at 3-5), the court need not deem Dr. Russell's statement of fact disputed.

9

11.) If he had, Dr. Russell would have recorded that request in his handwritten notes. (Doc. 57 at 6.) In his counter statement of material facts, Kirk denies that Dr. Russell did not ignore complaints voiced by Kirk. (Doc. 71 ¶¶ 10, 11.) Rather, Kirk asserts that the medical records attached as exhibits to Dr. Russell's affidavit clearly show that Kirk asked for an x-ray of his ankle, among other complaints. (*Id*.) With respect to this disputed fact, the court notes that Dr. Russell's typed notes state the following with respect to Kirk's July 30, 2009 visit:

> Advised patient that I would obtain shoulder x-ray. Patient wondered about x-ray of ankle, he walked into the treatment room without problems, initially he had a normal range of motion of the left ankle, until he noted that I was moving it and then he stiffened up. Advised him that I wanted him to continue current treatment with range of motion, (he stated the ankle was moving better after working on the range of motion since the last visit). Will have him work on range of motion.

(Doc. 57 at 16.)

Additionally, Dr. Russell states that he did not substitute spiritual healing, *i.e.*, tell Kirk to "pray for a healing," for an accepted medical practice. (Doc. 47 ¶ 12.) Finally, Dr. Russell was never contacted and asked to see Kirk again after the July 30, 2009 encounter. (Doc. 47 ¶ 13; Doc. 57 at 6.) In his counter statement of material facts, Kirk denies this statement, citing to the medical records attached as exhibits to both Dr. Russell's and Nurse Pendleton's affidavits. (Doc. 71 ¶ 13.) However, while

10

those records indicate that Dr. Russell reviewed the results of the August 5, 2009 x-ray, (*see* Doc. 57 at 19), there is nothing in those records indicating that Dr. Russell was contacted and asked to see Kirk after the July 30, 2009 visit.  As such, Dr. Russell's statement of fact, (Doc. 47 ¶ 13), is deemed admitted.

In addition to the counter statements set forth above, Kirk denies three of Dr. Russell's other statements: (1) the first time Dr. Russell was requested to see Kirk was in mid-July 2009, (Doc. 47 ¶ 2); (2) Dr. Russell was asked to see Kirk again on July 29, 2009, (*id*. ¶ 5); and (3) Dr. Russell did not substitute spiritual healing for the accepted medical practice, (*id*. ¶ 13).  (Doc. 71 ¶¶ 2, 5, 13.)   In all three counter statements, Kirk states first that until further discovery can be completed, he does not have any information or belief as to the truth of the statements and, therefore, denies them.  (Doc. 71 ¶¶ 2, 5, 11.)  This counter statement is rejected as the court has already ruled that it will consider the instant motions for summary judgment as filed and without directing further discovery.  *See supra* note 1, at 4-5.  Second, Kirk states that "there is nothing in the medical records which documents or confirms" the statements.  (*Id*.)  The court will let the medical records speak for themselves, and address Kirk's opposition in Discussion, Part III, *infra*.

**B.    Procedural History**

The relevant procedural history is as follows.  On April 11, 2011, Kirk filed a complaint against several prison officials and medical care providers at WCCF. (Doc. 1.)  On April 25, 2011, the court issued an order directing service of the complaint.  (Doc. 6.)  Defendant Dr. Russell filed a motion to dismiss on June 9, 2011.  (Doc. 12.)  However, prior to filing a brief in support of that motion to dismiss, Kirk filed an amended complaint.  (Doc. 13.)  As a result, the court issued an order deeming moot Defendant Dr. Russell's motion to dismiss.  (Doc. 15.)  Thereafter, Defendant Dr. Russell and the other Defendants filed motions to dismiss the amended complaint.  (Docs. 16 & 17.)  After the motions were ripe for disposition, the court issued a memorandum and order granting in part and denying in part the motions, and granted Kirk leave to file an amended complaint.  (Doc. 26.)

Kirk filed his amended complaint on January 26, 2012.  (Doc. 29.)  Nurse Pendleton filed an answer on February 21, 2012, as amended on February 22, 2012. (Doc. 36.)  Dr. Russell filed an answer on April 4, 2012.  (Doc. 37.)  On April 9, 2012, the court issued an order setting case management deadlines for the case.  (Doc. 39.)  Thereafter, on July 9, 2012, Nurse Pendleton and Dr. Russell filed separate

motions for summary judgment.  (Docs. 41 & 45.)  Following responsive and reply

briefing, these motions are now ripe for disposition.


## II.    **Standard of Review**

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for

the grant of summary judgment.  Rule 56(a) provides, "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a)[8] ; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A factual

dispute is "material" if it might affect the outcome of the suit under the applicable

substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

factual dispute is "genuine" only if there is a sufficient evidentiary basis that would

allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id*.  When

evaluating a motion for summary judgment, a court "must view the facts in the light

most favorable to the non-moving party," and draw all reasonable inferences in favor

---

[8]  *See* Fed. R. Civ. P. 56, Advisory Comm. Note (2010 Amendments) (The frequently cited standard for summary judgment is now set forth in Rule 56(a) rather than Rule 56(c)(2010). The Advisory Committee explains that despite the language change, "[t]he standard for granting summary judgment remains unchanged" and "[t]he amendments will not affect continuing development of the decisional law construing and applying these phrases.").

13

of the same.  *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005),

*cert. denied*, 546 U.S. 1094 (2006).

The moving party bears the initial burden of demonstrating the absence of a

disputed issue of material fact.  *See Celotex*, 477 U.S. at 324.  "Once the moving

party points to evidence demonstrating no issue of material fact exists, the non-

moving party has the duty to set forth specific facts showing that a genuine issue of

material fact exists and that a reasonable factfinder could rule in its favor."  *Azur v.*

*Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).  The non-moving

party may not simply sit back and rest on the allegations in its complaint; instead, it

must "go beyond the pleadings and by [its] own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, designate specific facts showing

that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (internal quotations

omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001)

(citations omitted).  Summary judgment should be granted where a party "fails to

make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."  *Celotex*,

477 U.S. at 322-23.  "'Such affirmative evidence – regardless of whether it is direct

or circumstantial – must amount to more than a scintilla, but may amount to less (in

the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232

(quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.    **Discussion**

In the instant motions, both Defendants Nurse Pendleton and Dr. Russell argue

that Kirk has failed to establish that they were deliberately indifferent to his serious

medical needs.[9] Prison officials are required under the Eighth Amendment to provide

basic medical treatment to prisoners. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir.

1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). To demonstrate a *prima*

*facie* case of Eighth Amendment cruel and unusual punishment based on the denial of

medical care, a plaintiff must establish that the defendant acted with "deliberate

indifference to [his] serious medical needs." *Estelle*, 429 U.S. at 104 (1976); *Durmer*

*v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993). There are two components to this

standard: Initially, a plaintiff must make an "objective" showing that the deprivation

was "sufficiently serious," or that the result of the defendant's denial was sufficiently

serious. Additionally, the plaintiff must make a "subjective" showing that the

defendant acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501

---

[9] Defendants present no argument as to whether Kirk's alleged injuries are "serious" and thereby satisfy that component of the deliberate indifference standard. (*See* Docs. 43 & 46.)

15

U.S. 294, 298 (1991); *see also Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).[10]

This test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients. Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment." *Little v. Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa. 1996) (citing *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979), quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

The Supreme Court has established that the proper analysis for deliberate indifference is whether a prison official "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 841 (1994). A complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment [as] medical malpractice does not become

---

[10] The "deliberate indifference to serious medical needs" standard is obviously met when pain is intentionally inflicted on a prisoner, where the denial of reasonable requests for medical treatment exposes the inmate to undue suffering or the threat of tangible residual injury, or when, despite a clear need for medical care, there is an intentional refusal to provide that care. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (quoting *White v. Napolean*, 897 F.2d 103, 109 (3d Cir. 1990); *Monmouth Cnty Corr. Instutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. When an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist. *Nottingham v. Peoria*, 709 F. Supp. 542, 547 (M.D. Pa. 1988). Mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim. *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). Further, if inadequate treatment results simply from an error in medical judgment, there is no constitutional violation. *See Durmer*, 991 F.2d at 69. However, where a failure or delay in providing prescribed treatment is deliberate and motivated by non-medical factors, a constitutional claim may be presented. *See id*; *Ordonez v. Yost*, 289 F. App'x 553, 555 (3d Cir. 2008) ("deliberate indifference is proven if necessary medical treatment is delayed for non-medical reasons").

In the instant case, turning first to Kirk's alleged injury to his left ankle, based on the record before the court on summary judgment, the court concludes that Kirk has failed to establish that either Defendant was deliberately indifferent to his serious medical needs. With respect to Nurse Pendleton, the record reflects that she responded to both of Kirk's requests for medical attention in a timely manner. In his first request in April 2009, Kirk complained only of a twisted ankle. (Doc. 44 at 6.)

Nurse Pendleton examined him two days later, noted the swelling of Kirk's left ankle, and prescribed a course of treatment. (*Id*.) This two-day delay, at most, would constitute negligence and therefore does not meet the standard for an Eighth Amendment violation. *Rouse*, 182 F.3d at 197; *Durmer*, 991 F.2d at 69. Nurse Pendleton examined Kirk again after his second request for medical attention, and continued Kirk's prescribed treatment. (Doc. 44 at 5.) Unfortunately, despite Nurse Pendleton's medical intervention, Kirk continued to suffer from discomfort after treatment.

As a result, Kirk was referred for treatment with Dr. Russell in mid-July 2009. (Doc. 47 ¶ 2.) The record reflects that Dr. Russell evaluated Kirk's ankle on two separate occasions. At the first visit, Dr. Russell noted slight swelling of the left ankle and prescribed range of motion exercises. (Doc. 57 at 3.) At the second visit, Dr. Russell evaluated Kirk's ankle again, noting a good range of motion until Kirk became aware of the nature of Dr. Russell's testing and presumably intentionally stiffened up his ankle. (*Id*. at 3-5.) Unfortunately, despite these evaluations and treatment by Dr. Russell, Kirk continued to suffer from discomfort.[11]

---

[11] Kirk asserts in his amended complaint that he was eventually transported to Geisinger Medical Center on August 12, 2009 for further treatment, but there is nothing in the record indicating what that treatment was for, his left ankle or otherwise. (*See* Doc. 29 ¶ 16.)

18

With respect to evaluation and treatment of Kirk's left ankle by these two Defendants, this is clearly a case where Kirk has been given medical attention and is dissatisfied with the course of treatment and subsequent results. An inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. *Durmer*, 991 F.2d at 69; *Spruill*, 372 F.3d at 235. Courts will not second guess whether a particular course of treatment is adequate or proper. *Parham v. Johnson*, 125 F.3d 454, 458 n.7 (3d Cir. 1997). Moreover, there is nothing in the record demonstrating that any significant delay in treating Kirk's left ankle was deliberate or intentional on the part of either Defendant. And finally, with respect to Kirk's assertion that an x-ray of his ankle should have been ordered, Kirk has failed to establish deliberate indifference. Under the well-established *Estelle* and *Durmer* principles, it is clear that contentions regarding a doctor's determination not to order testing sound in negligence, not deliberate indifference. *See Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986) (medical negligence does not expose a defendant to liability under § 1983). Simply put, "[a]llegations of negligent treatment are medical malpractice claims, and do not trigger constitutional protections." *Whooten v. Bussanich*, 248 F. App'x 324, 326 (3d Cir. 2007) (citing *Estelle*, 429 U.S. at 105-06). Therefore, under these circumstances and based on the documented course of

treatment set forth on the record, the court finds that Defendants Nurse Pendleton and Dr. Russell were not deliberately indifferent to Kirk's medical needs with respect to his left ankle injury. Thus, Kirk has failed to establish an Eighth Amendment violation. Defendants' motions for summary judgment with respect to Kirk's left ankle injury will be granted.

Turning to Kirk's alleged injuries to his left shoulder and back, the court finds that the conflicting accounts in the record with respect to these injuries and treatment thereof, create a genuine issue of material fact as to whether both Defendants were deliberately indifferent to Kirk's serious medical needs.[12] First, as to Nurse Pendleton, her affidavit submitted in support of her motion for summary judgment provides no response, denial or otherwise, to Kirk's allegations related to treatment of, or failure to treat, these alleged injuries. Instead, the requests for medical attention and corresponding notes attached to her affidavit indicate that Kirk did, in fact, complain of pain in his neck, back, and shoulder blades after the fall. Given the mostly illegible note associated with Kirk's second evaluation by Nurse Pendleton, the court is unable to determine whether Nurse Pendleton evaluated and treated these complaints made by Kirk. Further, in her affidavit, Nurse Pendleton asserts that after

_____

[12] However, the court finds that Dr. Russell was not deliberately indifferent to Kirk's medical needs related to his alleged back injury. *See infra* p. 22.

20

Kirk "continued to complain," she referred him for evaluation with Dr. Russell. (Doc. 44 ¶ 8.) But the nature and timing of these further complaints are unclear, and nothing in the record provides guidance. Thus, a genuine issue of material fact exists here with respect to whether Nurse Pendleton was deliberately indifferent to Kirk's alleged injuries to his back and left shoulder.

Second, as to Dr. Russell, the court notes the following disputes of fact. Initially, Dr. Russell argues that he has no knowledge of any events that occurred prior to being notified of a request for medical attention for Kirk in July 2009. (Doc. 46 at 7.) However, in her affidavit, Nurse Pendleton asserts that she consulted with Dr. Russell after her April 2009 evaluation of Kirk and he indicated that her prescribed treatment was appropriate and his intervention was unnecessary at that time. (Doc. 42 ¶ 9.) As such, it appears that the Defendants themselves have created a genuine issue of material fact as to Dr. Russell's awareness and treatment of Kirk's injuries.

Further, Dr. Russell does not address Kirk's assertion that he ordered an x-ray of his right shoulder rather than his left. Even if Dr. Russell's medical records indicate evaluation and treatment of Kirk's right shoulder, that alone does not answer the question of whether Dr. Russell was deliberately indifferent with respect to Kirk's

21

alleged injury to his left shoulder. Moreover, the fact that Kirk asserts that he complained of pain in the left shoulder and Dr. Russell counters that the complaint was about the right shoulder certainly points to a genuine issue of material fact.

The record, however, does establish that Dr. Russell evaluated Kirk's back for injury. Specifically, his handwritten notes from July 30, 2009 indicate that Kirk complained of back pain and, upon examination, Dr. Russell found his back and neck to have normal range of motion and to be nontender. (Doc. 57 at 4.) Unfortunately for Kirk, he allegedly continued to suffer from pain in his back after this evaluation. As the record reflects no further treatment by Dr. Russell, or a request for such treatment, this instance is a case where Kirk was given medical attention and is dissatisfied with the evaluation and subsequent results. As this court will not second guess whether a particular course of treatment is adequate or proper, *see Parham*, 126 F.3d at 458 n.7, Kirk has failed to establish a deliberate indifference to his medical needs by Dr. Russell with respect to his alleged back injury.

Finally, the court concludes that there is genuine issue of material fact related to Kirk's allegation that Dr. Russell told him to "pray for a healing" rather than treat all the alleged injuries, thereby establishing that he was deliberately indifferent to Kirk's serious medical needs. While Dr. Russell asserts, "Although I do hold to a

personal belief in God, it has never been my practice to substitute spiritual healing as a substitute for the accepted medical practice," (Doc. 57 at 6), the court finds this statement to be too vague and even unresponsive as to the question of whether Dr. Russell denied Kirk himself medical care based on a spiritual belief. As such, there exists a genuine issue of material fact here.

## IV.   Conclusion

For the reasons set forth above, Defendants Pendleton and Dr. Russell's motions for summary judgment will be granted with respect to Kirk's claims that they were deliberately indifferent to his serious medical needs related to his left ankle injury. Nurse Pendleton's motion will be denied as to Kirk's claims of deliberate indifference related to his back and shoulder injuries. And, Dr. Russell's motion will be denied as to the claims of deliberate indifference related to Kirk's shoulder injury, but granted as to the claims related to his back injury.

An appropriate order will issue.

S/Sylvia H. Rambo
United States District Judge

Dated: January 28, 2013.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CLARENCE J. KIRK,** | : | **CIVIL NO. 1:CV-11-00665** |
| | : | |
| **Plaintiff** | : | **(Judge Rambo)** |
| | : | |
| **v.** | : | |
| | : | |
| **WYOMING COUNTY** | : | |
| **CORRECTIONAL FACILITY,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

# O R D E R

In accordance with the accompanying memorandum, **IT IS HEREBY**

**ORDERED THAT** the motions for summary judgment (Docs. 41 & 45) are

**GRANTED** in part and **DENIED** in part as follows:

1) The motions for summary judgment (Docs. 41 & 45) are **GRANTED** as to

Defendants for Plaintiff's claim of deliberate indifference to his serious medical

needs related to his left ankle injury.

2) Defendant Nurse Pendleton's motion for summary judgment (Doc. 41) is

**DENIED** as to Defendant Pendleton for Plaintiff's claims of deliberate indifference

to his serious medical needs related to his back and left shoulder injuries.

3) Defendant Dr. Russell's motion for summary judgment (Doc. 45) is

**GRANTED** as to Defendant Dr. Russell for Plaintiff's claim of deliberate

indifference to his serious medical needs related to his back injury.

4) Defendant Dr. Russell's motion for summary judgment (Doc. 45) is

**DENIED** as to Defendant Dr. Russell for Plaintiff's claim of deliberate indifference

to his serious medical needs related to his left shoulder injury.

5) The court will issue a separate scheduling order.

S/Sylvia H. Rambo
United States District Judge

Dated: January 28, 2013.